**Opinion issued July 10, 2014**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-13-00721-CV**

———————————

**BRUCE I. SCHIMMEL, Appellant**

**V.**

**GARY MCGREGOR, TERI MCGREGOR, KRIS HALL, SOLEDAD PINEDA, LARRY BISHOP, CYNTHIA BISHOP, GEORGE CLARK, DEBORAH CLARK, AND CAROL SEVERANCE, Appellees**

---

**On Appeal from the 113th District Court**
**Harris County, Texas**
**Trial Court Case No. 2013-05146**

---

# O P I N I O N

In this interlocutory appeal, appellees Gary McGregor, Teri McGregor, Kris

Hall, Soledad Pineda, Larry Bishop, Cynthia Bishop, George Clark, Deborah

Clark, and Carol Severance (collectively, "the Buy-Out Owners"), sued Bruce Schimmel, an attorney hired by The Sands of Kahala Beach HOA, Inc. ("SOKB"), the homeowners' association for the subdivision in which the Buy-Out Owners lived, for tortious interference with prospective business relations, specifically, the sale of their respective beachfront properties to the City of Galveston. Schimmel moved to dismiss the Buy-Out Owners' tortious interference claim pursuant to the Texas Citizens Participation Act ("TCPA").[1] The trial court denied Schimmel's motion to dismiss. In two issues, Schimmel contends that the trial court erroneously (1) found that Schimmel's complained-of actions did not involve "matters of public concern" and did not implicate the exercise of his right to petition, right of free speech, or right of association and thus erroneously denied his motion to dismiss; and (2) refused to award Schimmel court costs, reasonable attorney's fees, and other expenses incurred in defending the action against him.

We reverse and remand for further proceedings.

### Background

The Buy-Out Owners all own beachfront property in the Sands of Kahala Beach, a small, gated subdivision located on Galveston Island. In September 2008, Hurricane Ike made landfall in the region and caused extensive property damage to numerous homes, including those of the Buy-Out Owners. Because their homes

---

[1] *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.001–.011 (Vernon Supp. 2013).

were allegedly more than fifty percent damaged, the Buy-Out Owners sought to sell their properties to the City of Galveston under a Federal Emergency Management Agency ("FEMA") program called the Hazard Mitigation Grant Program ("HMGP"). The Texas Department of Public Safety assists in administering this program. The Buy-Out Owners and an attorney for the City of Galveston signed agreements in September 2009 concerning the purchase of the respective properties.

SOKB and the remaining owners who owned property in the subdivision but did not wish to sell their property to the City of Galveston ("the Remaining Owners") opposed the Buy-Out Owners' plans to sell. Under the HMGP, the properties that the City of Galveston purchased "were to be kept as open space in perpetuity." This requirement concerned the SOKB, the entity in charge of collecting assessments and fees from the property owners within the subdivision, and the Remaining Owners, who believed that the required public use of the purchased land and the loss of a private roadway and utility easement would cause the value of their properties to drop.

Due to the dispute between the Buy-Out Owners, SOKB, and the Remaining Owners, in October 2009, the City of Galveston added a condition to the purchase of the Buy-Out Owners' properties: the president of SOKB's Board of Directors ("the Board") needed to sign a document releasing the City from paying future

3

homeowners' dues and other fees and assessments to SOKB once it purchased the properties. In December 2009, SOKB hired Schimmel, an attorney, to represent its interests and those of the Remaining Owners in the dispute with the Buy-Out Owners. SOKB refused to sign the releases and the Board voted to amend SOKB's by-laws to raise the voting requirement to remove directors from the Board, purportedly on Schimmel's advice. The Buy-Out Owners subsequently held a special meeting of the Board and elected new directors, including Kris Hall, one of the appellees, as the new President. Hall then signed the releases for the Buy-Out Owners' properties and delivered them to the City of Galveston.

Schimmel continued to work on behalf of SOKB and the Remaining Owners to convince the City of Galveston not to buy the Buy-Out Owners' properties until February 1, 2011, when he withdrew from representation. Ultimately, the time period to participate in the HMGP expired without the City of Galveston's having closed on the purchases of the Buy-Out Owners' properties.

The Buy-Out Owners, joined by SOKB, sued Schimmel on January 28, 2013, asserting claims for breach of fiduciary duty and equitable fee forfeiture. Neither of those claims is at issue in this interlocutory appeal.

On March 28, 2013, the Buy-Out Owners and SOKB filed their first amended petition. In addition to the breach of fiduciary duty and fee forfeiture claims, the Buy-Out Owners asserted a claim against Schimmel for tortious

4

interference with prospective business relations.[2]  The Buy-Out Owners alleged that a reasonable probability existed that they would have entered into a business relationship with the City of Galveston, that Schimmel intentionally interfered with the relationship, and that Schimmel's conduct was independently tortious and unlawful "in that Defendant Schimmel made fraudulent statements about these Plaintiffs to third parties and persuaded others to illegally boycott these Plaintiffs."

The Buy-Out Owners alleged that Schimmel made several misrepresentations that interfered with the purchase of their properties by the City of Galveston.  For example, in response to an article in the Houston Chronicle about the potential sale of the properties, Schimmel allegedly wrote to the author of the article and stated that if the City purchased the properties the Remaining Owners would lose their access to a nearby state highway because the private road in the subdivision would be demolished.  He also allegedly misrepresented to the author that all of the properties were behind the vegetation line and "repairable for less than 50% of their value," which would preclude them from participation in the HMGP.  Schimmel also allegedly made misrepresentations to the Board concerning how the HMGP's definition of "substantial damage" to the properties

---

[2]  SOKB did not join the homeowners in asserting this claim against Schimmel, and SOKB is not a party to this appeal, which concerns only the Buy-Out Owners' tortious interference claim.

was calculated;[3] to lot owners in the subdivision that the buyout would not include the opportunity to buy out all of the properties in the subdivision; and to various individuals that he "had no intention of changing any more By-Laws," that the SOKB had been working with the Buy-Out Owners to settle the dispute, and that developers no longer owned lots in the subdivision, even though they did.

The Buy-Out Owners also alleged that Schimmel had "systematically excluded members from voting [at resident meetings] in order to boycott the Buy-out owners," such as by quickly setting a voting eligibility date to prevent owners who had not paid their annual assessments from voting at meetings and by recommending the elimination of voting by proxy, which would affect the Buy-Out Owners who used their properties as vacation homes but did not live permanently in the subdivision. The Buy-Out Owners further alleged that Schimmel had stated that neither SOKB nor its Board had the power to waive assessments as required by the City of Galveston to purchase the properties, and "[w]ithout releases, the [City] would not close on the properties and [Schimmel] had the [Board] refuse to sign [the] release[s] which was an unreasonable restraint

---

[3] The Buy-Out Owners alleged that Schimmel told the Board that "the definition of Substantial Damage is damages that total at least 50% of the pre-event fair value of the property," but he allegedly knew that the fair market value of the property was based on the local appraisal district's value for the structure, which did not include the value of the land. According to the Buy-Out Owners, "This is a significant distinction which the BOD later misrepresented to FEMA when they alleged false damage estimates."

or alienation. Defendant Schimmel's position was that the Buy-[O]ut owners would not be allowed to sell to the [City] under any circumstances." The Buy-Out Owners alleged that they had suffered economic damages consisting of the difference between the proposed buy-out values and the market values of their properties.

On May 28, 2013, Schimmel filed a motion to dismiss under the TCPA. In this motion, Schimmel stated that the Buy-Out Owners served him with their first amended petition on March 28, 2013, and that this motion to dismiss addressed only the tortious interference claim raised for the first time in that amended petition.

Schimmel stated that he advised the Board and the Remaining Owners that he thought the issue concerning the value of the repairs to the Buy-Out Owners' properties, which was relevant to their eligibility to participate in the HMGP, was "a matter between [the Buy-Out Owners] and governmental agencies" and should not be pursued by SOKB, "but that if any lot owner wanted to pursue that issue on his or her own, it would aid [SOKB] by distracting [the Buy-Out Owners]." Schimmel argued that the TCPA protected these statements because they involved his right of association and right to petition regarding a matter of public concern. He argued that his statements to the Houston Chronicle reporter were "a 'communication' which is 'an exercise of the right of free speech' and related to an

exercise of the right of petition" and were made "in connection with a matter of public concern" because the statements related to the expenditure of government money and "interference with the community of the Subdivision and economic concerns." He asserted that those statements were also "reasonably likely to encourage consideration or review of an issue by" an executive or other governmental body or were "reasonably likely to enlist public participation in an effort to effect consideration of an issue by" an executive or other governmental body. With respect to his alleged statements to the Board, Schimmel argued that those statements were "an exercise of the right of association" and thus were entitled to protection under the TCPA.

Schimmel also argued that he was entitled to mandatory court costs, reasonable attorney's fees, and other expenses incurred in defending the claim pursuant to Civil Practice and Remedies Code section 27.009(a). Schimmel attached an affidavit setting out the amount of attorney's fees he had incurred in defending against the Buy-Out Owners' claims. This affidavit set out the billing rate, the date tasks were performed, the hours spent, and a description of the tasks completed.

Schimmel attached numerous exhibits to his motion to dismiss. One of these exhibits was an order of dismissal in a suit filed by the Buy-Out Owners in the Southern District of Texas against the City of Galveston and several

8

Department of Public Safety officials involved in the administration of the HMGP. The Buy-Out Owners had raised claims under the Fourteenth Amendment and Section 1983,[4] arguing that the City of Galveston's failure to close on the purchase of their properties deprived them of funds under the HMGP without due process of law. The district court granted the defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) and, in its order, noted that state agencies involved with administering the HMGP have "wide discretion in administering the program." The court stated, "Nothing in the regulations [governing the HMGP] dictates that qualified property owners are entitled to participate in the program or limits the State's discretion in determining a property owner's qualifications for the program or reviewing those qualifications at any time in the process." The court concluded that the Buy-Out Owners "have no entitlement to HMGP funds or a property right to such funds" and ultimately dismissed their suit.

In response to Schimmel's motion to dismiss, the Buy-Out Owners argued that their claim fell within a statutory exemption to the TCPA because Schimmel was engaged in the business of selling his legal services, he was paid to render legal services by SOKB and the Remaining Owners, and his conduct at issue in the suit occurred while he was rendering legal services. The Buy-Out Owners also argued that Schimmel had not timely filed his motion to dismiss because the TCPA

---

[4] *See* 42 U.S.C. § 1983 (2006) (providing civil cause of action for deprivation of rights).

required such motions to be filed not later than the sixtieth day after service of the legal action and Schimmel filed his motion to dismiss on the sixty-first day after the homeowners served him with their amended petition.

The Buy-Out Owners further stated,

The individual Plaintiffs['] claims are not based on, related to, or in response to a right of Schimmel to voice free speech, have a right of association or a right to petition. It is totally about his tortious interference with Plaintiffs' prospective business and contractual relations which caused the individual Plaintiffs money damages. Plaintiffs' claims are based upon the independent torts of fraud, misrepresentations and illegal boycott.

They further argued, "Schimmel's conduct is at issue here, not anyone's free speech, right to associate, or to file a lawsuit." The Buy-Out Owners also challenged the affidavits that Schimmel had submitted with his motion to dismiss on the ground that Schimmel stated that he is "personally acquainted with the facts stated herein, except where I state that I am testifying on information and belief, in which case I am testifying based on information and my belief thereof." The Buy-Out Owners argued that these affidavits did not constitute competent evidence because "personal acquaintance" is not "personal knowledge." The homeowners also challenged Schimmel's attorney's fees affidavit on the ground that it did not meet the requirements for establishing reasonable and necessary attorney's fees as set out by the Texas Supreme Court in *El Apple I, Ltd. v. Olivas*.

The Buy-Out Owners attached their own affidavits to their response and argued that these affidavits established a prima facie case for tortious interference with prospective business relations.[5] The affidavits were substantively identical. The affidavits set out numerous representations allegedly made by Schimmel that, according to the Buy-Out Owners, caused the City of Galveston to fail to purchase their properties. As an example, Kris Hall, one of the Buy-Out Owners, averred:

> But for Schimmel's misrepresentations and conduct there is a reasonable probability that all of our buy-out contracts would have closed. . . . Schimmel's independent misrepresentations and boycott, set out above, prevented our agreements from closing and the purchase of our property by the [City]. Schimmel's acts, set out above, were done with a conscious desire to prevent our sales and purchases from occurring. I, as well as the other Buy-Out Owners, have suffered actual damages as a result of this interference of Schimmel. We have incurred thousands of dollars in legal fees and have lost the difference between the buy-out values that we were to be paid and the lesser amounts that our properties now are valued at. There was a reasonable probability that I, as well as the rest of the Buy-Out Owners, would have entered into a business relationship and closed our contracts with the [City].

The Buy-Out Owners did not attach affidavits from attorneys with the City of Galveston or from personnel with the Department of Public Safety, which assisted in administering the HMGP, nor did they attach any other evidence from persons

---

[5]   Although the Buy-Out Owners pleaded a claim for tortious interference with prospective relations, the Buy-Out Owners admit in their affidavits submitted in opposition to Schimmel's motion to dismiss that they had signed contracts with the City of Galveston to purchase the properties for specified amounts.

11

involved with the City's decision not to close on the purchase of the Buy-Out Owners' properties.

Schimmel filed a reply and asserted that he had timely filed his motion to dismiss. He argued that although the Buy-Out Owners filed their amended petition with the trial court on March 28, 2013, the Buy-Out Owners did not serve him with a copy of the petition. He did not see a copy of the petition until April 1, when a legal assistant to his attorney in the case downloaded the petition from the ProDoc eFiling service. In the alternative, Schimmel moved the trial court to allow late filing of the motion to dismiss, as is permitted by the TCPA. Schimmel also argued that the Buy-Out Owners' supporting affidavits were conclusory and not supported by evidence that a reasonable probability existed that their buy-out contracts with the City of Galveston would have closed but for Schimmel's allegedly tortious actions. He further argued that the Buy-Out Owners did not provide "any evidence that any act of Schimmel's caused the [Texas Department of Public Safety] to order the City not to close the alleged contracts."

After an oral hearing, the trial court issued an order denying Schimmel's motion to dismiss. The order stated:

> The parties announced on the record their stipulation that the Motion relates only to the Plaintiffs' cause of action for damages resulting from an alleged tortious interference with a prospective relationship between Plaintiffs and the City of Galveston. . . .

> The Court finds that the Motion was timely filed.

12

The Court finds that the docket conditions in the court prevented the scheduling of the hearing on the Motion within 30 days following the date of its filing.

The Court finds that the Plaintiffs' tortious interference claim does not affect Schimmel's right to participate in government.

The Court finds that Schimmel's actions alleged as the basis of the tortious interference claim concerned matters disputed between individual parties, and the statements alleged as a basis of the claim were not made in connection with a matter of public concern.

The Court finds that Schimmel's actions alleged as the basis of the tortious interference claim were not a part of Schimmel's exercise of the right of association defined in TEX. CIV. PRACT. & REM. CODE §27.001(2).

The Court finds that Schimmel's actions alleged as the basis of the tortious interference claim do not concern Schimmel's right to petition defined in TEX. CIV. PRACT. & REM. CODE §27.001(4).

The Court finds that the tortious interference claim was not brought to deter or prevent Schimmel's exercise of his constitutional rights, for an improper purpose, for harassment, to cause unnecessary delay, or to increase litigation costs.

The trial court did not award attorney's fees or costs to either party. This interlocutory appeal followed.

## Texas Citizens Participation Act

In his first issue, Schimmel contends that the trial court erroneously determined that his communications that are the basis of the Buy-Out Owners' tortious interference claim did not involve "matters of public concern" and did not implicate his "exercise of the right to petition," "exercise of the right of free speech," or "exercise of the right of association."

13

### A. Standard of Review and Applicable Law

In enacting the TCPA, the Legislature stated that the purpose of the statute "is to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." TEX. CIV. PRAC. & REM. CODE ANN. § 27.002 (Vernon Supp. 2013); *KTRK Television, Inc. v. Robinson*, 409 S.W.3d 682, 688 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). The TCPA created "an avenue at the early stage of litigation for dismissing unmeritorious suits that are based on the defendant's exercise" of certain constitutional rights. *In re Lipsky*, 411 S.W.3d 530, 539 (Tex. App.—Fort Worth 2013, orig. proceeding). The Legislature has directed courts to construe the statute liberally "to effectuate its purpose and intent fully." TEX. CIV. PRAC. & REM. CODE ANN. § 27.011(b) (Vernon Supp. 2013); *Robinson*, 409 S.W.3d at 688.

Under the TCPA, if a party files a legal action that is "based on, relates to, or is in response to" the defendant's exercise of the right of free speech, right to petition, or right of association, the defendant may file a motion to dismiss the action. TEX. CIV. PRAC. & REM. CODE ANN. § 27.003(a) (Vernon Supp. 2013). The TCPA statutorily defines "exercise of the right of association," "exercise of the right of free speech," and "exercise of the right to petition." *See id.*

§ 27.001(2)–(4) (Vernon Supp. 2013). The TCPA defines "exercise of the right of association" as "a communication between individuals who join together to collectively express, promote, pursue, or defend common interests." *Id.* § 27.001(2). "Communication" is further defined as "the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic." *Id.* § 27.001(1). The TCPA defines "exercise of the right of free speech" as "a communication made in connection with a matter of public concern." *Id.* § 27.001(3). "Matter of public concern" includes issues relating to health or safety; environmental, economic, or community well-being; the government; a public official or public figure; or a good, product, or service in the marketplace. *Id.* § 27.001(7). The statutory definition of "exercise of the right to petition" includes, among other things, "a communication in connection with an issue under consideration or review by a legislative, executive, judicial, or other governmental body or in another governmental or official proceeding." *Id.* § 27.001(4)(B).

A party filing a motion to dismiss under the TCPA must file the motion "not later than the 60th day after the date of service of the legal action." *Id.* § 27.003(b). The trial court may extend the time to file a motion to dismiss upon a showing of good cause. *Id.*

When deciding whether to grant a motion to dismiss a lawsuit pursuit to the TCPA, the trial court must "consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based." *Id.* § 27.006(a) (Vernon Supp. 2013); *Robinson*, 409 S.W.3d at 688. The court must determine, after a hearing, whether the moving defendant has demonstrated by a preponderance of the evidence that the legal action is "based on, relates to, or is in response to the party's exercise of the right of free speech, the right to petition, or the right of association." TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b) (Vernon Supp. 2013); *Robinson*, 409 S.W.3d at 688. We review de novo the trial court's determination whether the defendant carried this burden. *Robinson*, 409 S.W.3d at 688.

If the trial court determines that the defendant has met his burden, the burden then shifts to the plaintiff to establish "by clear and specific evidence a prima facie case for each essential element of the claim in question." TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c); *Robinson*, 409 S.W.3d at 688. The Legislature's use of "prima facie case" in the second step of the inquiry implies a minimal factual burden: "[a] prima facie case represents the minimum quantity of evidence necessary to support a rational inference that the allegation of fact is true." *Robinson*, 409 S.W.3d at 688; *Rodriguez v. Printone Color Corp.*, 982 S.W.2d 69, 72 (Tex. App.—Houston [1st Dist.] 1998, pet. denied). The statute

16

requires that the plaintiff's proof address and support each "essential element" of every claim and that the proof constitute "clear and specific evidence." *Robinson*, 409 S.W.3d at 688. Because the statute does not define "clear and specific," we apply the ordinary meaning of these terms. *Id.* at 689. "Clear" means "unambiguous," "sure," or "free from doubt," and "specific" means "explicit" or "relating to a particular named thing." *Id.* We review the pleadings and evidence in the light most favorable to the plaintiffs. *Newspaper Holdings, Inc. v. Crazy Hotel Assisted Living, Ltd.*, 416 S.W.3d 71, 80–81 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) Accordingly, here, if we determine that Schimmel carried his initial burden of proof, we must examine the pleadings and the evidence presented in response to Schimmel's motion to dismiss to determine whether the Buy-Out Owners marshaled "clear and specific" evidence to support each element of their tortious interference claim. *See Robinson*, 409 S.W.3d at 689.

### B. Applicability of TCPA to the Buy-Out Owners' Claim

#### 1. Timeliness of Motion to Dismiss

The Buy-Out Owners argue that this Court should affirm the trial court's ruling denying Schimmel's motion to dismiss on the basis that he did not timely file the motion.

Section 27.003(b) provides that a party filing a motion to dismiss must file the motion "not later than the 60th day after the date of service of the legal action." TEX. CIV. PRAC. & REM. CODE ANN. § 27.003(b). The statute further provides, however, that the trial court may extend the time to file a motion to dismiss "on a showing of good cause." *Id.*; *see also Newspaper Holdings*, 416 S.W.3d at 79 ("The TCPA sets strict deadlines for filing, hearing, and ruling on a motion to dismiss. Absent a showing of good cause, the defendant must move to dismiss pursuant to the TCPA 'not later than the 60th day after the date of service of the legal action.'").

Here, the Buy-Out Owners' first amended petition, which was the first pleading in which the Buy-Out Owners raised the tortious interference claim against Schimmel, bears a file-stamped date of March 28, 2013. Schimmel filed his motion to dismiss on May 28, 2013, sixty-one days later. In his initial motion to dismiss, Schimmel stated, "On March 28, 2013, Plaintiffs served Schimmel with their Plaintiffs' Amended Petition, in which, for the first time, Natural Plaintiffs added a separate cause of action against Schimmel alleging tortious interference with prospective relations."

In response to the motion to dismiss, the Buy-Out Ownerts argued that the motion was untimely because Schimmel filed his motion on the sixty-first day after he had been served with the action and he could not demonstrate that good cause

18

existed for his late filing. In reply, Schimmel asserted that his motion was not untimely because, although he received notice that the first amended petition had been filed on March 28, 2013, the Buy-Out Owners did not serve him with a copy of the petition on that date. Instead, he did not receive a copy of the petition until April 1, 2013, when his counsel's legal assistant downloaded the amended petition from the ProDoc eFiling service. In the alternative, Schimmel sought leave of court to allow the late filing of his motion.

In the order ruling on the motion to dismiss, the trial court explicitly stated, "The Court finds that the Motion was timely filed." We conclude that, although Schimmel filed his motion to dismiss one day late, in making a statement concerning the timeliness of the motion, the trial court implicitly ruled that if Schimmel technically filed the motion late he had good cause for the late filing. We therefore decline to dismiss this suit on the ground that Schimmel did not timely file his motion to dismiss.

### 2. *Applicability of Services Exclusion*

The Buy-Out Owners also argue that the TCPA does not apply to this case because this case falls under the statutory exemption for commercial speech found in section 27.010(b).

Section 27.010(b) states:

[The TCPA] does not apply to a legal action brought against a person primarily engaged in the business of selling or leasing goods or

19

services, if the statement or conduct arises out of the sale or lease of goods, services, or an insurance product, insurance services, or a commercial transaction in which the intended audience is an actual or potential buyer or customer.

TEX. CIV. PRAC. & REM. CODE ANN. § 27.010(b) (Vernon Supp. 2013). The party asserting the exemption bears the burden of proving its applicability. *See Newspaper Holdings*, 416 S.W.3d at 89; *see also Pena v. Perel*, 417 S.W.3d 552, 555 (Tex. App.—El Paso 2013, no pet.) ("The burden of proving the applicability of an exemption under Section 27.010 is on the party asserting it.").

The Buy-Out Owners argue that their tortious interference claim falls within this exemption because (1) Schimmel was primarily engaged in the business of selling his legal services; (2) the Buy-Out Owners' cause of action arose from Schimmel's conduct consisting of representations of fact about Schimmel's services; (3) Schimmel's conduct occurred in the course of delivering his legal services; and (4) the intended audience of his conduct was a potential buyer, the City of Galveston. We disagree that Schimmel's conduct falls within this exemption.

The El Paso Court of Appeals addressed a similar situation in *Pena*. In that case, Pena, who had been indicted on two counts of intoxicated manslaughter and two counts of failure to stop and render aid, hired Dolph Quijano to represent him. *Pena*, 417 S.W.3d at 553. A jury ultimately convicted Pena, assessed punishment at confinement in the Texas Department of Criminal Justice, and imposed a total of

$30,000 in fines. *Id.* at 553–54. Pena and his wife then began running advertisements that were critical of Quijano. *Id.* at 554. Quijano hired Bobby Perel to represent him, and Perel sent letters to local newspapers and to the Texas Board of Pardons and Paroles to inform it of Pena's conduct. *Id.* One of Perel's letters to the Board of Pardons and Paroles informed it that he believed Pena had not taken responsibility for his underlying criminal actions and that Pena was responsible for "vicious ads" attacking Quijano, and he requested that the Board consider this information when making decisions about Pena's parole. *Id.* Pena filed suit against Quijano and Perel, asserting, among other things, that they had conspired to slander and defame him by sending the letter to the Board. *Id.* The trial court granted Perel's motion to dismiss pursuant to the TCPA. *Id.*

On appeal, Pena argued that the trial court erred in dismissing his claims because his claims fell within the "commercial speech" exemption to the TCPA. *Id.* at 555. The El Paso Court of Appeals noted that Pena's suit was based on the letter that Perel had sent to the Board. *Id.* The court reasoned, "The letter does not arise out of the sale or lease of goods, services, or an insurance product or a commercial transaction. Further, the Board of Pardons and Parole is not an actual or potential buyer or customer of any goods or services sold by Perel." *Id.* The court held that Pena failed to establish the applicability of the exemption. *Id.*

21

Here, Schimmel allegedly made statements that, according to the Buy-Out Owners, induced the City of Galveston to back out of its agreements to purchase the Buy-Out Owners' properties. When Schimmel made the statements at issue, he was undisputedly working as an attorney for SOKB and the Remaining Owners. The ultimate intended audience for his statements, however, was the City of Galveston. Schimmel did not represent the City of Galveston, nor was the City a "potential buyer or customer" of Schimmel's legal services. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.010(b). We therefore conclude, as the El Paso Court of Appeals did in *Pena*, that the Buy-Out Owners have failed to establish the applicability of the "commercial speech" exemption. *See id.*; *see also Pena*, 417 S.W.3d at 555; *Newspaper Holdings*, 416 S.W.3d at 89 ("With respect to the newspaper, it is undisputed that NHI was in the business of reporting community events, but the Hotel's complained-of statements do not arise out of the lease or sale of the goods or services that NHI sells—newspapers.").

### 3. *Whether the Buy-Out Owners' Claim Falls Under the TCPA*

The Buy-Out Owners complain about numerous actions and statements allegedly made by Schimmel during the course of his representation of SOKB and the Remaining Owners. All of these statements, whether they were made to a journalist at the Houston Chronicle, attorneys with the City of Galveston, or members of the Board, concerned or were related to the City's plan to purchase the

22

Buy-Out Owners' properties and were made to further Schimmel's clients' interest in ensuring that should the purchase of the properties go forward SOKB would receive compensation for the loss of future assessments on the purchased properties.

The TCPA defines "exercise of the right to petition" as including "a communication in connection with an issue under consideration or review by a legislative, executive, judicial, or other governmental body . . . ." TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(4)(B). The statute defines "exercise of the right of free speech" as "a communication made in connection with a matter of public concern." *Id.* § 27.001(3). And a "matter of public concern" is further defined as "an issue related to health or safety; environmental, economic, or community well-being; the government; a public official or public figure; or a good, product, or service in the marketplace." *Id.* § 27.001(7). None of these statutory definitions includes a requirement that the communications be made to a particular individual or entity, such as a governmental body, to constitute protected conduct.

SOKB and the Remaining Owners retained Schimmel to represent their interests during the dispute concerning the buy-out of the Buy-Out Owners' properties. All of Schimmel's challenged statements, regardless of to whom the statements were made, related to this dispute and were made "in connection with an issue under consideration or review" by the City of Galveston and the Texas

23

Department of Public Safety, both of which are governmental bodies. *See id.* § 27.001(4)(B) (defining "exercise of the right to petition"). The Buy-Out Owners' action for tortious interference with prospective business relations is therefore "based on, relates to, or is in response to" Schimmel's exercise of the right to petition on behalf of his clients. *See id.* § 27.003(a) (providing that defendant may move to dismiss legal action that is based on, relates to, or is in response to exercise of right to petition).

Moreover, the Buy-Out Owners' claim implicates not just Schimmel's exercise of the right to petition on behalf of his clients but also Schimmel's exercise of his right to freedom of speech on behalf of his clients. *See id.* § 27.001(3) (defining "exercise of the right of free speech" as "a communication made in connection with a matter of public concern"); *id.* § 27.001(7) (defining "matter of public concern"). Contrary to the trial court's determination, in its order denying Schimmel's motion to dismiss, that the dispute at issue "concerned matters disputed between individual parties" and thus "were not made in connection with a matter of public concern," Schimmel's statements all related to and were made in connection with the purchase by the City of Galveston, a governmental entity, of five properties in a small subdivision, the purchase of which would allegedly damage the values of the neighboring properties and would damage the future revenue stream of SOKB, the homeowners' association, by

denying it the ability to collect future assessments on the bought-out properties. In addition to relating to the government, the dispute at issue also relates to "economic or community well-being," all of which are issues included in the statutory definition of "matter of public concern" under the TCPA. *See id.* § 27.001(7).

In arguing that their claim is not based on, does not relate to, and is not in response to Schimmel's exercise of constitutionally protected rights, the Buy-Out Owners focus on the fact that their claims "are based upon the independent torts of fraud, misrepresentations and illegal boycott," which do not implicate constitutional protections. That argument, however, is relevant to the *second* step of the inquiry—whether the Buy-Out Owners have demonstrated a prima facie case for relief on every essential element of their tortious interference claim. *See In re Lipsky*, 411 S.W.3d at 543 ("But chapter 27 dictates that we should review evidence concerning whether [the defendants'] statements were defamatory and thus actionable in the second part of our review, in which [the plaintiff] has the burden of establishing 'by clear and specific evidence a prima facie case for each essential element of the claim in question.'").

The Buy-Out Owners also argue that Schimmel's affidavits supporting his motion to dismiss are incompetent and inadmissible because they state that he is "personally acquainted with facts stated therein," instead of stating that they are

based on personal knowledge, and that some portions state that Schimmel is testifying based on information and belief. We first note that, in making a determination on a motion to dismiss, the trial court is not limited to considering only supporting and opposing affidavits, but the court "shall consider the pleadings" as well. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.006(a). Thus, even if Schimmel's affidavits do not constitute competent and admissible evidence, his motion to dismiss does not necessarily fail. Secondly, we agree with Schimmel that there is no meaningful distinction between "personal knowledge" and "personal acquaintance," and to hold otherwise is to impose an unduly restrictive reading on the personal knowledge requirement for affidavits. *See* WEBSTER'S NEW COLLEGIATE DICTIONARY 8 (1956) (defining "acquaintance" as "[p]ersonal knowledge (of a person or thing) which results from becoming acquainted"). We therefore conclude that Schimmel's affidavits are competent and admissible to support his motion to dismiss.

We hold that Schimmel met his initial burden to show, by a preponderance of the evidence, that the Buy-Out Owners' claim is based on, relates to, or is in response to his exercise of the right to petition and his exercise of the right of free speech. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b)(1)–(2).

26

### *4. Buy-Out Owners' Prima Facie Case*

Because we have held that Schimmel's statements forming the basis of the Buy-Out Owners' tortious interference claim constitute protected conduct under the TCPA, we must now determine whether the Buy-Out Owners met their burden to establish, by clear and specific evidence, a prima facie case for every essential element of their tortious interference claim. *See id.* § 27.005(c). To prevail on a claim for tortious interference with prospective business relations, the plaintiffs must establish that (1) a reasonable probability existed that the plaintiffs would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiffs injury; and (5) the plaintiffs suffered actual damage or loss as a result. *See Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013); *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001) (holding that plaintiff must establish that defendant's conduct was independently tortious or wrongful, meaning that defendant's conduct "would be actionable under a recognized tort"). "Conduct that is merely 'sharp' or unfair is not actionable and cannot be the basis for an

27

action for tortious interference with prospective relations . . . ." *Sturges*, 52 S.W.3d at 726.

One of the essential elements for which the Buy-Out Owners had to establish a prima facie case is causation, that is, whether Schimmel's interference proximately caused their injury, which, in this case, is the City of Galveston's failure to close on the purchase of their properties. *See Coinmach Corp.*, 417 S.W.3d at 923 (listing causation as element of tortious interference with prospective relations claim). As evidence to support their contention that they are entitled to relief on their tortious interference claim, the Buy-Out Owners presented to the trial court identical affidavits from each property owner as well as copies of several e-mails between Schimmel and members of the Board. They did not present any affidavits or other admissible evidence from any individual at the City of Galveston, the city attorney's office, the Texas Department of Public Safety, which allegedly informed the City to put a hold on the transactions while officials conducted a new "substantial damage determination" of the Buy-Out Owners' properties, or any other official or agency with decision-making authority concerning the City's purchase of the properties. Instead, the only evidence of this element that the Buy-Out Owners produced is the statements in their identical affidavits that "[b]ut for Schimmel's misrepresentations and conduct there is a reasonable probability that all of our buy-out contracts would have closed," that

28

"Schimmel's independent misrepresentations and boycott, set out above, prevented our agreements from closing and the purchase of our properties by the [City]," and that "Schimmel's action and conduct, set out above, caused me and the other Buy-Out Owners money losses . . . that would not have occurred, but for [Schimmel's] conduct."

We agree with Schimmel that the Buy-Out Owners presented only their conclusory statements, unsupported by any facts, that Schimmel's actions caused the City of Galveston to fail to close on the purchases. Evidence of Schimmel's conduct, by itself, is not evidence that, with respect to communications made to other individuals and entities, that conduct caused the City not to purchase the Buy-Out Owners' properties. The fact that Schimmel's alleged conduct occurred roughly contemporaneously with the City of Galveston's and the Department of Public Safety's consideration of whether to move forward with the purchases does not establish that Schimmel's conduct *caused* the governmental agencies to act as they did.

Furthermore, in October 2009, the City of Galveston required the Buy-Out Owners to obtain a release from future assessments, signed by SOKB, as a condition for the purchases to close, two months before SOKB and the Remaining Owners hired Schimmel to represent their interests. The Buy-Out Owners contend that Schimmel tortiously interfered with their prospective contracts with the City of

Galveston because he urged the Board not to sign the required releases, and, as a result of the Board's refusal to sign the releases, the City did not proceed with the purchases. Ultimately, however, one of the appellees, Kris Hall, signed the releases on behalf of SOKB once he became president of the Board, but the City of Galveston did not close on the purchases.

Additionally, in the federal suit between the Buy-Out Owners and the City of Galveston and several Department of Public Safety employees the district court ruled that governmental entities have "wide discretion" in administering the HMGP and that nothing in the regulations governing the HMGP "dictates that qualified property owners are entitled to participate in the program or limits the State's discretion in determining a property owner's qualifications for the program or reviewing those qualifications at any time in the process." The court thus concluded that the Buy-Out Owners had no "entitlement to HMGP funds or a property right to such funds." Thus, a court has already determined during the litigation arising out of this dispute that the City of Galveston and the Department of Public Safety acted within their discretionary authority when they declined to close on the purchase of the Buy-Out Owners' properties.

As the Texas Supreme Court has held, "merely inducing a contract obligor to do what it has a right to do is not actionable interference." *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997); *Newspaper Holdings*, 416 S.W.3d

30

at 87. Even if Schimmel induced the City of Galveston and the Department of Public Safety not to close on the purchase of the Buy-Out Owners' properties, as the Buy-Out Owners allege, the Buy-Out Owners would have no cause of action against him for inducing the City or the Department to do that which they had a right to do—not to purchase the Buy-Out Owners' houses.

We also note that, in this regard, the Buy-Out Owners have made no argument, with citation to authority, that SOKB and the Board were legally required or obligated to sign the releases that the City of Galveston required to close on the purchases, and they have produced no evidence on such a point. The Buy-Out Owners have thus presented no evidence that Schimmel induced the Board to take an action that it was not legally authorized to take. This is, therefore, not a situation in which Schimmel, as a corporate agent, induced the corporation, SOKB, to breach a contractual obligation. *See, e.g.*, *Holloway v. Skinner*, 898 S.W.2d 793, 796 (Tex. 1995) (noting that "a party cannot tortiously interfere with its own contract" and holding that even when corporate agent induces corporation to breach contractual obligation, agent will not be held liable for tortious interference with corporation's contract unless plaintiff can demonstrate that agent "acted in a fashion so contrary to the corporation's best interests that his actions could only have been motivated by personal interests").

31

We conclude that the Buy-Out Owners' supporting evidence does not establish, by clear and specific evidence, a prima facie case on the essential element of causation. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c) ("The court may not dismiss a legal action under this section if the party bringing the legal action establishes by clear and specific evidence a prima facie case for *each essential element* of the claim in question.") (emphasis added); *Coinmach Corp.*, 417 S.W.3d at 923 (stating that interference as proximate cause of plaintiff's injury is essential element of tortious interference with prospective relations claim).

We therefore hold that because Schimmel established by a preponderance of the evidence that the Buy-Out Owners' tortious interference claim is based on, relates to, or is in response to his exercise of his right to petition on behalf of his clients and his right of free speech and because the Buy-Out Owners failed to establish a prima facie case on every essential element of their tortious interference claim, the trial court erroneously denied Schimmel's motion to dismiss under the TCPA. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b), (c).

We sustain Schimmel's first issue.

## Award of Costs and Attorney's Fees

In his second issue, Schimmel contends that because the trial court erroneously denied his motion to dismiss it also erroneously failed to award him

32

mandatory costs, reasonable attorney's fees, and expenses incurred in defending against the claim, as required by the TCPA.

Section 27.009(a)(1) provides that if the court orders dismissal of a legal action pursuant to the TCPA, the court "shall award to the moving party court costs, reasonable attorney's fees, and other expenses incurred in defending against the legal action as justice and equity may require." TEX. CIV. PRAC. & REM. CODE ANN. § 27.009(a)(1) (Vernon Supp. 2013). When an appellate court determines that the trial court erroneously denied a defendant's motion to dismiss under the TCPA, the appropriate disposition of the case is to reverse the trial court's denial of the motion and remand for the trial court to conduct further proceedings pursuant to section 27.009(a) and to order dismissal of the suit. *See Newspaper Holdings*, 416 S.W.3d at 90.

The Buy-Out Owners contend that, even if the trial court erroneously denied Schimmel's motion to dismiss, remand is not appropriate in this case because Schimmel's affidavit on attorney's fees was "incompetent evidence of reasonableness and necessity" under the Texas Supreme Court's decision in *El Apple I, Ltd. v. Olivas*.

*Olivas* involved a claim for sex discrimination and retaliation pursuant to the Texas Commission on Human Rights Act, under which courts calculate attorney's fees using the lodestar method, or the number of hours worked multiplied by

33

prevailing hourly rates. *See* 370 S.W.3d 757, 758–59 (Tex. 2012). The court explained that the lodestar method of calculating attorney's fees involves two steps: (1) the court first determines the reasonable number of hours spent by counsel in the case and a reasonable hourly rate for such work; and (2) the court then multiples the number of such hours by the applicable rate, which yields the lodestar, which may then be adjusted up or down to reach a reasonable fee for the case. *Id.* at 760. The court held that a party seeking attorney's fees when the lodestar method is used "bears the burden of documenting the hours expended on the litigation and the value of those hours." *Id.* at 761.

Unlike the attorneys in *Olivas*, who presented only their aggregate number of hours spent on the case and their respective billing rates without further indicating how they spent their time, Schimmel's attorney's fees affidavits stated the date on which work was performed, the number of hours spent, the particular tasks involved, and the applicable billing rate. *See id.* at 763 ("[P]roof [of attorney's fees] should include the basic facts underlying the lodestar, which are: (1) the nature of the work, (2) who performed the services and their rate, (3) approximately when the services were performed, and (4) the number of hours worked."); *see also City of Laredo v. Montano*, 414 S.W.3d 731, 736 (Tex. 2013) ("In *El Apple*, we said that a lodestar calculation requires certain basic proof, including itemizing specific tasks, the time required for those tasks, and the rate

charged by the person performing the work."). We therefore do not agree with the homeowners that Schimmel's attorney's fees affidavits are insufficient under *Olivas*.

Finally, even if Schimmel's attorney's fees evidence presented with his motion to dismiss were insufficient to establish the reasonableness and necessity of the fee amount, because Schimmel is statutorily entitled to an award of attorney's fees, the appropriate disposition of this case would be to remand the attorney's fees issue back to the trial court for further proceedings. *See Alphonso v. Deshotel*, 417 S.W.3d 194, 202 (Tex. App.—El Paso 2013, no pet.) ("[G]iven that Appellees are entitled to attorney's fees and costs under the [TCPA] because the trial court granted their motion to dismiss and we have upheld that ruling on appeal, the proper disposition in this case is to reverse the award of attorney's fees and costs [which was not supported by an affidavit admitted into evidence] and remand that issue back to the trial court for a new trial."); *see also Uhl v. Uhl*, 524 S.W.2d 534, 538 (Tex. Civ. App.—Fort Worth 1975, no writ) ("When a [party] is clearly entitled to attorney's fees in some amount but where there had been no proof in the trial court of the amount there may be severance of that issue with remand to the trial court for a new trial on that issue.").

We hold that because Schimmel has established his entitlement to dismissal under the TCPA, he is entitled to "court costs, reasonable attorney's fees, and other

expenses incurred in defending against the legal action as justice and equity may require." TEX. CIV. PRAC. & REM. CODE ANN. § 27.009(a)(1); *see also Newspaper Holdings*, 416 S.W.3d at 90 ("We therefore reverse the trial court's denial of the defendants' motions to dismiss, and we remand the case to the trial court for further proceedings as required by the statute and to order dismissal of the suit.").

We sustain Schimmel's second issue.

## Conclusion

We reverse the trial court's order denying Schimmel's motion to dismiss and remand the case to the trial court for further proceedings relating to Schimmel's attorney's fees, costs, and expenses and to order dismissal of the suit.


Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Bland, and Brown.